UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| AMY RITENOUR, ) | Case No.: |
| ) | |
| v. ) | |
| ) | |
| STATE OF TENNESSEE DEPARTMENT OF ) | Jury Demand |
| HUMAN SERVICES, Defendant. ) | |
| ) | |
| ) | |

## COMPLAINT

Comes Now Plaintiff, Amy Ritenour ("Ms. Ritenour"), by and through counsel, and sues the Defendant, State of Tennessee Department of Human Services ("DHS"), and for her cause of action, states:

## I. JURISDICTION

1. Jurisdiction in this case is invoked pursuant to 29 U.S.C. §§2612, 2615(a)(1), 2617(a)(2) and Defendant's interference with Ms. Ritenour's attempt to take leave covered by the family-care provisions of the Family Medical Leave Act ("FMLA"), and by the Defendant's retaliation against Ms. Ritenour for having attempted to take FMLA leave pursuant to the family-care provisions of the FMLA.

2. DHS is a Tennessee State agency located in and doing business in Nashville, Tennessee, at, among other locations, Citizen's Building 400 Deaderick Street, Nashville, TN 37243, and 1000 2nd Avenue North, Nashville, TN 37202.

3. The Tennessee Attorney General has been properly served with a copy of the Summons and the instant Complaint in accordance with TENN. R. CIV. P. 4.04(6).

4. Ms. Ritenour was employed by DHS from on or around May 16, 2007, through on or around September 25, 2008.

1

5. Ms. Ritenour has been employed by DHS for at least 12 months and for at least 1,250 hours of service during the 12-month period preceding her discharge on or around September 30, 2008.

6. Ms. Ritenour was eligible for protection under the family-care provisions of the FMLA in August 2008 and September 2008.

7. Ms. Ritenour was at all material times an "employee" of DHS within the meaning of the FMLA, and DHS was at all relevant times an "employer" as defined by the FMLA.

8. Defendant terminated Ms. Ritenour's employment on or around September 30, 2008.

## II. GENERAL ALLEGATIONS

9. Ms. Ritenour is a single mother with three children, and at all times between August 1, 2008 and September 30, 2008, Plaintiff's minor son had serious mental health condition that was a "serious health condition" as that term is defined by 29 C.F.R. 825.114 .

10. Virginia T. Lodge was at all relevant times a DHS Commissioner and the individual who signed the DHS notice of termination sent to Ms. Ritenour on or around September 30, 2008.

11. Deborah E. Story was at all relevant times a DHS Commissioner and an individual who received a copy of the DHS notice of termination sent to Ms. Ritenour on or around September 20, 3008.

12. Glenda Shearon was at all relevant times a DHS Assistant Commissioner and an individual who received a copy of the DHS notice of termination sent to Ms. Ritenour on or around September 20, 3008.

13. Kelvin Meeks was at all relevant times a DHS Field Management Director 1, District 6, an individual who received a copy of the DHS notice of termination sent to Ms. Ritenour on or around September 20, 3008, and the individual who signed the DHS Separation Notice that is part of Ms. Ritenour's Tennessee and/or DHS personnel file.

14. Tanesha Hooper was at all relevant times a DHS manager who supervised Ms. Ritenour's work and was a decision-maker involved in the decision to terminate Ms. Ritenour.

15. Shar Amador was at all relevant times a DHS manager who supervised Tanesha Hooper's work and Ms. Ritenour's work, and Ms. Amador was a decision-maker involved in the decision to terminate Ms. Ritenour.

16. Gary Stockton was at all relevant times a DHS Human Resources Manager who was a decision-maker involved in the decision to terminate Ms. Ritenour.

17. In August 2008, Ms. Ritenour needed and sought leave for the express purpose of providing and/or obtaining care for her minor son due to her son's serious health condition .

18. Before taking leave in August 2008, Ms. Ritenour gave her supervisors and DHS's Human Resources Manager sufficient information to cause them to know and/or reasonably suspect that Ms. Ritenour's son had a "serious health condition" as that term is defined by the FMLA and 29 C.F.R. 825.114 and that Ms. Ritenour was requesting FMLA leave to care for her minor son's serious health condition.

19. In August 2008, Ms. Ritenour gave her supervisors and DHS's Human Resources Manager sufficient information to cause them to know and/or reasonably suspect that: (1) Ms. Ritenour would have an ongoing need for leave between August 2008 and October 1, 2008; and (2) the needed leave would be covered by the family-care provisions of the FMLA with respect to any employee who was otherwise eligible for FMLA family-care leave protections.

20. At no time in August 2008 or September 2008, did DHS ask Ms. Ritenour to provide any medical evidence or FMLA certification forms showing that she was needed leave covered by the family-care provisions of the FMLA leave.

3

21. At no time in August 2008 or September 2008, did DHS provide Ms. Ritenour with FMLA leave documentation, such as a federal Department of Labor WH-380-F FMLA Certification of Health Care Provider For Family Member's Serious Health Condition form and/or a federal Department of Labor WH-381 FMLA Notice of Eligibility and Rights and Responsibilities form.

22. In August 2008, Gary Stockton and/or other individuals who supervised Ms. Ritenour told Ms. Ritenour she was not eligible for FMLA leave.

23. DHS denied Ms. Ritenour's request for FMLA leave in August 2008, without orally or in writing giving Ms. Ritenour a reason for denying her leave request.

24. After personally rejecting Ms. Ritenour's request for leave in August 2008, Gary Stockton told Ms. Ritenour to contact Kelvin Meeks make her request for thirty (30) days of non-FMLA leave.

25. Ms. Ritenour attempted to request leave from Kelvin Meeks in August 2008, through an email to Ms. Hooper, but Ms. Hooper refused to pass on Ms. Ritenour's request for leave to Mr. Meeks.

26. Ms. Ritenour did not attend work between August 21, 2008 and September 5, 2008.

27. Ms. Ritenour left telephone voice messages for one or more of her supervisors at their respective office telephone extensions regularly between August 22, 2008 and September 30, 2008, to discuss her absence from work, but received no response regarding her leave from any of her supervisors during that time period.

28. In the normal course of Defendant's payroll cycle, Ms. Ritenour was paid for at least some of the leave she took between August 21, 2008 and September 5, 2008, and prior to being terminated she received no reprimands in any way related to her leave between August 21, 2008 and September 5, 2008.

29. Ms. Ritenour did not have a personal conversation with any of her supervisors from on or around August 23, 2008 through on or around September 2, 2008.

30. As of September 3, 2008, Ms. Ritenour had a need to take leave from her employment with DHS to care for one or more of Ms. Ritenour's minor son due her son's serious health condition.

31. On or around September 3, 2008, Ms. Ritenour spoke to Tanesha Hooper, who told Ms. Ritenour at that time that Ms. Hooper re-stated her earlier refusal to contact Kelvin Meeks to request permission for Ms. Ritenour to take any leave to care for her minor son.

32. As of September 3, 2008, Ms. Ritenour had a need to take leave from her employment with DHS to care for one or more of Ms. Ritenour's minor children due the childrens' respective serious health conditions.

30. On or around September 3, 2008, Tanesha Hooper told Ms. Ritenour that Ms. Hooper would speak to Shar Amador to see if Ms. Ritenour could take any leave to care for her minor children and get back to Ms. Ritenour with an answer.

31. Contrary to her promise to Ms. Ritenour on or around September 3, 2008, Ms. Hooper did not provide Ms. Ritenour with a response from Ms. Amador regarding Ms. Ritenour's request for leave to care for her minor son.

32. Ms. Ritenour took leave to care for her minor son on September 3-5, 2008.

33. On or around September 4, 2008, Ms. Ritenour called Ms. Hooper at her office extension and left her a message asking Ms. Hooper to call Ms. Ritenour about her need for leave, but Ms. Hooper did not return Ms. Ritenour's call that day.

34. On or around September 5, 2008, Ms. Hooper called Ms. Ritenour on the telephone and told her that Ms. Hooper had authorized Ms. Hooper to "handle the situation" regarding Ms. Ritenour's leave requests as Ms. Hooper deemed appropriate.

35. On or around September 5, 2008, Ms. Hooper told Ms. Ritenour to return to work on September 8, 2008, and Ms. Hooper told Ms. Ritenour that Ms. Hooper would create a "restricted leave plan" for Ms. Ritenour until Ms. Ritenour qualified for one week of annual leave and one week of sick leave.

36. Ms. Hooper promised to create a restricted leave plan for Ms. Ritenour pertaining to Ms. Ritenour's need to take leave to care for her son's serious health condition. The terms of that restricted leave plan were never articulated to Ms. Ritenour prior to her discharge.

37. Other than: (1) telling Ms. Ritenour that Ms. Hooper had the authority to handle Ms. Ritenour's request for leave as Ms. Hooper deemed fit; and (2) promising to construct a "restricted leave plan," Ms. Ritenour was not provided with any new policies or policy clarifications at any time between September 5, 2008 and her termination pertaining to the taking of leave to care for her minor son's serious mental health condition.

38. On September 8, 2008, Ms. Ritenour returned to work per Ms. Hooper's instructions, and Ms. Ritenour was present for work between September 8, 2008 and September 10, 2008, during which time she received no discipline or disciplinary warnings related to her lack of attendance between September 3-5, 2008.

39. Ms. Ritenour was never provided with, and she has never seen, a copy of a "restricted leave plan" that Ms. Hooper had mentioned to Ms. Ritenour on September 8, 2008.

40. On or about September 10, 2008, Ms. Ritenour spoke to Gary Stockton with a copy of DHS' Employee Handbook in-hand and requested FMLA leave to care for her minor son's serious mental health condition.

41. On or around September 10, 2008, Ms. Ritenour told Gary Stockton that she believed that she was eligible for FMLA leave to take care of her minor children, and that she had been wrongfully denied FMLA leave in August 2008, to take care of her minor children.

42. At no time did Gary Stockton provide Ms. Ritenour with any forms or paperwork to provide to a certified health care provider, or any other request for information regarding the nature of Ms. Ritenour's need for leave.

43. Neither Mr. Stockton nor any other of Ms. Ritenour/s supervisors or managers provided Ms. Ritenour with any information about her rights under the FMLA in August 2008, or September 2008.

44. On or around September 10, 2008, Gary Stockton told Ms. Ritenour again that she was not eligible for FMLA leave, and he also refused to personally authorize her to take any unpaid "special leave."

45. On or around September 10, 2008, Ms. Ritenour told Gary Stockton about Ms. Hooper's refusal to ask Kelvin Meeks for leave to care for her minor son, and Mr. Stockton replied by asking Ms. Ritenour to give Ms. Hooper a written request for "special leave" on specific dates.

46. From on or around September 8, 2008 through September 12, 2008, Ms. Hooper was on vacation.

47. Mr. Stockton asked Ms. Ritenour to leave him a copy of her written leave request without stating in what manner Ms. Ritenour was to provide him the request.

48. Mr. Stockton did not inform Ms. Ritenour that he knew Ms. Hooper was on vacation or that Ms. Ritenour could not take the requested leave until Ms. Hooper returned from vacation.

49. Ms. Ritenour gave DHS a written request for additional leave through October 1, 2008, to care for her minor son due to his ongoing serious health condition. Pursuant to Mr. Stockton's direction, Ms. Ritenour placed the written leave request on Ms. Hooper's desk on or around September 10, 2008; she

7

Case 3:09-cv-00803   Document 1   Filed 09/02/09   Page 7 of 14 PageID #: 7

also left a copy of the written leave request on the top of her desk in a visible location on September 10, 2008.

50. Ms. Ritenour's written leave request said she was willing to return to work on September 28, 2008, if it was necessary.

51. On or around September 11, 2008, Ms. Ritenour sent an electronic mail ("email") message from her personal email account to Gary Stockton at his State-provided email address, alerting Mr. Stockton to the fact that Ms. Ritenour had left the written leave request on Ms. Hooper's desk.

52. Ms. Ritenour's September 11, 2008 email to Mr. Stockton asked Mr. Stockton to call her if he had any questions about her leave and informed Mr. Stockton where on Ms. Ritenour's desk Mr. Stockton could locate his copy of the written leave request.

53. On or around September 12, 2008, Ms. Ritenour left a voicemail message on Shar Amador's office telephone extension, but Ms. Adamore did not respond to Ms. Ritenour's voicemail message.

54. Neither Mr. Stockton nor Ms. Amadore contacted Ms. Ritenour between September 11, 2008 and September 19, 2008.

55. On or around September 19, 2008, Ms. Hooper telephoned Ms. Ritenour at her residence and informed Ms. Ritenour that:

- Gary Stockton had been unable to find either the written leave request that Ms. Ritenour had placed on Ms. Hooper's desk on or around September 10, 2008, or the copy Ms. Ritenour had left on her own desk for Mr. Stockton;

- Ms. Hooper had allowed other workers to use her desk while Ms. Hooper was on vacation and that one of those workers may have misplaced Ms. Ritenour's written leave request; and

- Ms. Ritenour should call Mr. Stockton regarding the locations of the written leave request.

56. During their September 19, 2008 conversation, Ms. Ritenour reminded Ms. Hooper that Ms. Ritenour was taking leave to care for her son's serious mental health condition, and Ms. Hooper did not thereafter tell Ms. Ritenour that she had to return to work.

57. After speaking with Ms. Hooper on or around September 19, 2008, Ms. Ritenour spoke to Mr. Stockton, who told Ms. Ritenour that her because her supervisor had not known where she was, Ms. Ritenour's absences had been considered unexcused, and he told her that her job was therefore in jeopardy.

58. During their September 19, 2008 conversation, Ms. Ritenour reminded Mr. Stockton that Ms. Ritenour was taking leave to care for her son's serious mental health condition, and Ms. Hooper did not thereafter tell Ms. Ritenour that she had to return to work.

59. Neither Ms. Hooper, Mr. Stockton, nor any other individual who supervised Ms. Ritenour or otherwise worked for DHS asked Ms. Ritenour for a copy of the written leave request Ms. Ritenour left on Ms. Hooper's desk after Ms. Hooper informed Ms. Ritenour that Ms. Hooper could not find the leave request.

60. During their September 19, 2008 conversation, Mr. Stockton refused to tell Ms. Ritenour why he had not attempted to contact her at any time between September 11, 2008 and September 19, 2008.

61. Prior to being terminated, Ms. Ritenour received no reprimand relating in any way to leave taken by her.

62. On or around October 3, 2008, Kelvin Meeks spoke to Ms. Ritenour and told her that she had been denied FMLA leave because Ms. Ritenour's supervisors had determined that Ms. Ritenour had not been not qualified for FMLA leave in August 2008 and September 2008, because DHS deemed her to be a probationary and "interim employee."

63. Ms. Ritenour filed a complaint with the United States Department of Labor ("DOL") regarding her termination and the denial of her request for FMLA leave.

64. During the DOL's investigation into Ms. Ritenour's complaint, DHS informed the DOL that it had denied Ms. Ritenour FMLA leave all throughout August 2008 and September 2008 because Ms. Ritenour was a probationary and/or an interim DHS employee.

65. During the DOL's investigation into Ms. Ritenour's complaint, DHS informed the DOL that it had terminated Ms. Ritenour because she took leave on dates including September 10, 2008 and September 12, 2008.

66. At no time during August 2008 or September 2008 was Ms. Ritenour an interim employee.

67. DHS provided the DOL with a copy of the email message Ms. Ritenour sent to Gary Stockton on or around September 11, 2008, regarding Ms. Ritenour's written request for leave to care for her minor children.

68. Ms. Ritenour's minor son at all relevant time had been diagnosed with a serious mental disorder.

69. Virginia T. Lodge wrote a termination notice letter stating that DHS had taken into account, *inter alia*, Ms. Ritenour's absences between September 10, 2008, and September 12, 2008, in determining to terminate Ms. Ritenour.

70. As of September 25, 2008, at which time Ms. Ritenour's supervisors recommended Ms. Ritenour's termination, DHS did not have any medical information about the reason for Ms. Ritenour's absences between September 10, 2008 and September 19, 2008, other than the information Ms. Ritenour had provided to them.

71. Prior to recommending Ms. Ritenour's termination, none of the supervisors who recommended Ms. Ritenour's termination on or around September 25, 2008, had sought or obtained legal counsel specifically regarding the legality of the recommendation to terminate Ms. Ritenour.

72. Prior to recommending Ms. Ritenour's termination, none of the individuals who made the decision to terminate Ms. Ritenour had sought or obtained legal counsel specifically regarding the legality of the recommendation to terminate Ms. Ritenour.

73. Prior to recommending Ms. Ritenour's termination, none of the supervisors who recommended Ms. Ritenour's termination on or around September 25, 2008, had sought or obtained legal counsel to determine whether Ms. Ritenour was eligible for protection under the FMLA.

74. Prior to recommending Ms. Ritenour's termination, none of the individuals who terminated Ms. Ritenour had sought or obtained legal counsel to determine whether Ms. Ritenour was eligible for protection under the FMLA.

75. Virginia T. Lodge neither sought nor obtained legal counsel specifically regarding the legality of the recommendation to terminate Ms. Ritenour before adoting the recommendation to terminate Ms. Ritenour.

76. Virginia T. Lodge neither sought nor obtained legal counsel sought or obtained legal counsel to determine whether Ms. Ritenour was eligible for protection under the FMLA before she adopted the recommendation to terminate Ms. Ritenour that she obtained from Ms. Ritenour's supervisors.

### III. COUNT I - FMLA FAMILY-CARE LEAVE INTERFERENCE

77. Ms. Ritenour incorporates herein the factual allegations in paras. 1-76 of this Complaint.

78. Between September 10, 2008 and the time Ms. Ritenour's supervisors recommended Ms. Ritenour's termination, Ms. Ritenour's supervisors believed that Ms. Ritenour was absent from work

during that same time period in order to care for her minor son and/or to help her minor son obtain care from a health care provider.

79. When Virginia T. Lodge approved Ms. Ritenour's supervisors' recommendation to terminate Ms. Ritenour in September 2008, Ms. Lodge believed that Ms. Ritenour had been absent from work in September 2008, to care for her minor son and/or to help her minor son obtain care from a health care provider.

80. Ms. Ritenour's termination on or around September 25, 2008 constituted an unlawful interference with Ms. Ritenour's right to take intermittent FMLA leave and to discourage Ms. Ritenour from taking FMLA leave.

### IV. COUNT II - FMLA - RETALIATION

81. Ms. Ritenour incorporates herein all of the factual allegations in paragraphs 1-80 of this Complaint.

82. The termination of Ms. Ritenour on September 25, 2008, was undertaken by DHS in order to retaliate against Ms. Ritenour for attempting to take protected FMLA leave.

83. Defendant retaliation against Ms. Ritenour was not undertaken by Defendant with a good faith belief that the termination of Ms. Ritenour was lawful under the FMLA.

### V. COUNT III - THRA SEX DISCRIMINATION

84. Ms. Ritenour incorporates herein all of the factual allegations in paragraphs 1-83 of this Complaint.

85. Defendant's denial of leave to Ms. Ritenour to enable her to care for her minor son, as well as Ms. Ritenour's subsequent discharge, were because of Ms. Ritenour's sex and violative of the Tennessee Human Rights Act.

## VI. COUNT IV - THRA RETALIATION

86. Ms. Ritenour incorporates herein all of the factual allegations in paragraphs 1-85 of this Complaint.

87. Defendant denial of leave to Ms. Ritenour to care for one or more of her minor son, as well as her subsequent discharge, were undertaken by Defendant in retaliation for Ms. Ritenour's attempt to engage in activity protected by the Tennessee Human Rights Act.

## VII. DAMAGES

88. Ms. Ritenour incorporates herein all of the factual allegations in paragraphs 1-87 of this Complaint.

89. Ms. Ritenour has made good faith efforts to mitigate her damages and obtain new employment.

90. As a direct and proximate result of the acts and omissions of Defendant, Ms. Ritenour has suffered and will continue to suffer lost significant amounts of base wages, lost promotional opportunties, lost bonuses, lost benefits, severe humiliation, embarrassment, and emotional distress, attorney's fees, legal expenses, and other general damages.

## VIII. RELIEF SOUGHT AGAINST DEFENDANT

WHEREFORE, Amy Ritenour, prays that proper process issue and be served upon the Defendant in this action in the manner prescribed by law; and WHEREFORE, Ms. Ritenour demands Judgment against the Defendant for:

- Compensatory damages, including, but not limited to lost base wages and benefits;
- Reinstatement and promotion;
- Expungement of all records of improper discipline from Plaintiff's personnel files;
- Front pay in lieu of reinstatement to her former position with Defendant;
- Injunctive relief preventing these retaliatory practices by Defendant;
- Liquidated damages;
- Punitive damages;
- Damages for humiliation, embarrassment, and emotional distress;
- Reasonable attorney fees and all costs;
- All other remedies to which Ms. Ritenour is entitled; and
- A jury to try all issues, when joined.

Respectfully submitted,

/s Matthew Salada

MATTHEW SALADA (TN BPR# 20279)
Law Office of Matthew A. Salada
2002 Richard Jones Rd., Suite B-200
Nashville, TN 37215
Tel: (615) 724-0856
Fax: (615) 216-8376
Attorney for Plaintiff Amy Ritenour

14