UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

AMY RITENOUR             )
                                     )
v.                              )     No. 3:09-0803
                                   )     JUDGE CAMPBELL
STATE OF TENNESSEE DEPARTMENT   )
OF HUMAN SERVICES            )

MEMORANDUM

I.  Introduction

Plaintiff Amy Ritenour filed suit against her former employer, the State of Tennessee

Department of Human Services ("DHS"), alleging interference and retaliation claims under the

Family Medical Leave Act ("FMLA"), as well as sex discrimination and retaliation claims under

the Tennessee Human Rights Act ("THRA").  In an Order entered November 6, 2009, Plaintiff's

THRA claims were dismissed without prejudice for lack of subject matter jurisdiction and

Plaintiff's prayer for punitive and emotional distress damages under the FMLA was dismissed

with prejudice.  (Docket No. 13, Order.)

DHS now moves for summary judgment (Docket No. 21) on Plaintiff's remaining FMLA

claims.  Plaintiff filed a response in opposition to the motion (Docket No. 26), to which DHS

filed a reply (Docket No. 38).  DHS also filed a Motion To Strike Information Regarding

Department of Labor Investigation (Docket No. 36), to which Plaintiff has not filed a response.[1]

---

[1]The Court allowed Plaintiff's counsel to withdraw on September 1, 2010 (Docket No. 33, Order) after counsel filed the response to the summary judgment motion.  Substitute counsel has not entered an appearance on Plaintiff's behalf.

1

## II. Factual Background

Plaintiff is a single parent of three children, all of whom have special needs. Plaintiff's sixteen-year-old son, James, began receiving therapy in kindergarten. He has been diagnosed as bipolar, which is a chronic condition. He has also been diagnosed with oppositional defiant disorder. James has a history of suicide attempts, and at times he demonstrates violent and explosive behavior. Plaintiff's ten-year-old daughter, Renee, has attention deficit hyperactivity disorder ("ADHD"), post-traumatic stress syndrome, severe anxiety, and a reading disability. Plaintiff's eight-year-old son, Michael, has severe ADHD.

Plaintiff began working for DHS on May 16, 2007, as an interim employee through a special position classification available only to DHS benefit recipients. On April 16, 2008, Plaintiff transferred into a full-time position as a Clerk 2. (Docket No. 23-1, Meeks Aff. at 1.) Plaintiff accrued 7.5 hours of annual leave and 7.5 hours of sick leave every month.

By mid-August 2008, Plaintiff had exhausted all of her annual and sick leave. (Id. at 1-2.) James's condition had worsened and Plaintiff felt she needed to be home to supervise James and to arrange in-home services for him through Centerstone in Nashville. Although Plaintiff requested in-home services for James in August, such services did not actually begin until late October or early November. (Docket No. 23-11, Henry Depo. at 56.)

Plaintiff claims that she informed all of the supervisors in her chain of command–from her direct supervisor, Tanesha Hooper, to Hooper's supervisor, Shar Amador, to Amador's supervisor, Kelvin Meeks–about her children's disabilities in general and about her specific reasons for wanting to take unpaid leave in August and September 2008. Plaintiff states that she asked Hooper for leave without pay in mid-August. Hooper sent Plaintiff to Gary Stockton, the

2

DHS human resources contact, and Plaintiff met with Stockton in his office. Plaintiff reported that she needed a lot of time away from work, but the conversation was very short because Stockton cut off Plaintiff while she was speaking. Stockton told Plaintiff that she did not qualify for FMLA leave because she was an interim employee; however, Plaintiff believed she was not an interim employee at that time. Stockton directed Plaintiff to talk to her supervisor about obtaining thirty (30) days of "special leave" without pay. Plaintiff responded that she had already talked to her supervisor, who sent her to him. Nonetheless, after this conversation with Stockton, Plaintiff believed she was on FMLA leave from August 20th forward "[b]ecause no one said I didn't get leave[,]" and "no one said that I wasn't approved." Plaintiff did not fill out FMLA paperwork because neither Stockton nor Hooper gave her any forms to fill out.[2] (Docket

---

[2]The state's FMLA policy is eighteen (18) pages long. (Docket No. 23-28.) It provides that FMLA leave must be granted to an employee who requests leave to care for a son or daughter with a serious health condition or if the employee has a serious health condition resulting in her inability to perform one or more essential job functions. The policy defines a "serious health condition" as an "illness, injury, impairment, or physical or mental condition" involving a period of incapacity or treatment connected with inpatient care or continuing treatment by a health care provider. (Id. at 2-3.) Where the employee or family member is receiving continuing treatment by a health care provider, "absence from work due to mental illness caused by stress [and] allergies . . . qualify as serious health conditions for which FMLA leave must be granted." (Id. at 4.) State employees may take intermittent FMLA leave if leave is medically necessary to care for an employee's own serious health condition or the serious health condition of a family member. (Id. at 6.)

If the employee does not have a leave balance, FMLA leave must taken as unpaid leave. (Id.) The employee requesting unpaid FMLA leave "must explain the reasons why the leave is needed in order that the appointing authority may be able to determine leave eligibility[.]" If the employee fails to explain the reasons leave is needed, FMLA leave may be denied. (Id. at 7.)

Where the ordinary thirty-day notification of a need for FMLA leave is not possible "because the employee has no knowledge of the exact time when the leave will need to begin or because of a medical emergency, notice must be given as soon as practicable, normally within one or two business days of when the employee knows the date leave will be needed." The employee "should notify the supervisor of the need for leave and the anticipated timing and duration of the leave." The supervisor "may request additional information to determine if the employee is requesting FMLA leave specifically and to obtain the necessary details of the leave

3

No. 23-20, Plaintiff's Depo. at 49, 51-57, 59.)

Other evidence in the record both supports and undermines Plaintiff's testimony that she asked for unpaid FMLA leave in mid-August to care for her son, James, due to his deteriorating psychological condition. In an email summarizing dates Plaintiff missed work in August 2008, Kelvin Meeks, Field Management Director 2, attributed Plaintiff's absences in August to her own call-in reports stating that she was making repeated efforts to take her children to the doctor for physicals and vaccinations. (Docket No. 23-30.) Tennessee Urgent Care wrote excuses for Plaintiff and James for their visits to the clinic on August 6 for James's sports physical. (Docket No. 23-26.)

The "Employee Attendance And Leave Authorization Forms" that Hooper completed for Plaintiff in August and September 2008 show that Plaintiff was on unapproved leave from Monday, August 25 to Friday, August 29 and from Tuesday, September 2 through Friday, September 5. (Docket No. 23-32 at 1 & 3.) Plaintiff admits that she did not report to work during the last week of August and the first week of September. (Docket No. 23-20, Ritenour

---

being taken." Employees who fail to provide notice of the need for FMLA leave within the required time frame are subject to discipline, but they may not be denied the leave. (Id. at 11.)

The appointing authority may require medical certification to support FMLA leave and must give notice to the employee of that requirement each time medical certification is required. When the need for leave is unforeseeable, the employee must provide supporting certification within a reasonable period of time set by the appointing authority, based on the particular medical circumstances. An employee who fails to provide certification within the time frame may be denied leave continuation. (Id. at 11, 14.)

The appointing authority must also provide the employee with written notice detailing specific obligations of the employee and consequences of failure to meet the obligations. Such notice must be given within a reasonable time after the employee notifies the appointing authority of the need for FMLA leave, preferably between one and two business days. (Id. at 15, 17.)

A poster outlining FMLA rights was displayed in Plaintiff's workplace. (Docket No. 23-5; Docket No. 23-1, Meeks Aff. at 4.)

4

Depo. at 67-69.) DHS did not terminate Plaintiff's employment for these unexcused absences, nor did DHS discipline Plaintiff. (Docket No. 23-1, Meeks Aff. at 2.)

Hooper and Plaintiff had a conversation in September 2008, however, during which Plaintiff described her children's health issues in such a way that Hooper believed Plaintiff should talk to Stockton about taking family medical leave. (Docket No. 29-3, Hooper Depo. at 38-39.) Plaintiff apparently tried to contact Stockton because, on September 2, 2008, Stockton returned a telephone call to Plaintiff. All calls at DHS, except the calls of high-level managers, are tape-recorded, and Plaintiff was aware of the taping.

The transcript of the September 2 call between Stockton and Plaintiff appears to be the first time that the two talked about Plaintiff's need for unpaid leave, although Plaintiff recalled that the conversation occurred in August. Plaintiff informed Stockton that she was out of sick and vacation time, and she needed to know what her options were as far as "taking some time with no pay or the family leave" because Hooper did not know the details. (Docket No. 23-33 at 2.) Stockton told Plaintiff that she could request family leave and "there's nothing stopping you from that[,]" but he also stated: "The only way that you gonna be authorized any time off, is it a family medical emergency?" to which Plaintiff replied, "Not exactly." Stockton did not ask Plaintiff what she meant. (Docket No. 29-1, Stockton Depo. at 36-37.) Instead, he responded, "Then you can't apply for family medical leave; you can always request special leave without pay." (Docket No. 23-33 at 2-3.) Although Stockton knew there were other non-emergency medical situations that would fall under the category of unforeseen FMLA leave, Stockton did not ask Plaintiff about her circumstances to make a determination whether her situation fell

5

within other categories of unforeseen FMLA leave.[3]  (Docket No. 29-1, Stockton Depo. at 53.)

During the September 2 telephone conversation, Plaintiff informed Stockton that all three of her children have special needs and "it's like a three ring circus constantly."  She also described a litany of things that had gone wrong for her in the prior two weeks, including that her washing machine broke down resulting in her children having no uniform school clothes to wear, which caused them to be suspended from school, and her need to find new Section 8 housing and pack her family's belongings for a move by the first of October.[4]  Plaintiff emphasized her lack of family or a boyfriend to help her with all the tasks confronting her, and she declared that she could not work eight hours a day while looking for a place to live and packing a three-bedroom house.  (Id. at 3-4.)

Stockton advised Plaintiff to make an appointment with the Employee Assistance Program ("EAP") and he suggested other community agencies she might contact for help.  He

───────────────

[3]As to the comment, "[t]hen you can't apply for family medical leave," Stockton explained during his deposition that he really meant Plaintiff could apply for FMLA leave. (Docket No. 29-1, Stockton Depo. at 31-32.)  A reasonable jury would likely question the credibility of that explanation.
    Stockton also justified his comment by stating that Plaintiff was away from work at that point and to "request family medical leave and not be at work is considered an emergency, and that would not be normal procedures in a family medical leave request.  You normally have to request family medical leave in advance, and get prior approval before taking family medical leave."  Because Plaintiff stated she did not "exactly" have a family medical emergency, Stockton believed her situation did not merit emergency family medical leave.  He conceded, however, that he was not the approving authority for FMLA leave.  (Docket No. 29-1, Stockton Depo. at 37-40, 52.)
    On summary judgment, the Court must examine the facts in the light most favorable to Plaintiff and therefore, the Court takes as true that Stockton told Plaintiff she could not apply for FMLA leave.

[4]Plaintiff did not, in fact, move her family to different housing, and at the time of her deposition in late April 2010, Plaintiff and her children were living in the same residence they inhabited in 2008.  (Docket No. 23-20, Ritenour Depo. at 8.)

6

instructed her to ask her supervisor to send a memorandum to Kelvin Meeks requesting special leave without pay.[5]  After reviewing Plaintiff's August attendance record with her, Stockton further advised Plaintiff to consider how much more time she could afford to be off work without pay.  Plaintiff replied that money was probably the least of her issues and her "biggest thing" was finding a new place to live and packing her household.  (Id. at 6.)  Stockton did not make arrangements for Plaintiff to complete FMLA paperwork because she asked only about her family leave options and she did not specifically request the FMLA forms.  Stockton knew that Plaintiff did not have to request FMLA leave in writing.  (Docket No. 29-1, Stockton Depo. at 41-42, 85.)

On Wednesday, September 3, 2008, Hooper called Plaintiff to ask what she had learned from Stockton.  Plaintiff relayed Stockton's direction that Hooper should send a memorandum to Meeks on Plaintiff's behalf requesting special leave without pay.  Plaintiff provided Hooper with a synopsis of her life issues similar to the summary she gave to Stockton.  Hooper wanted to know how long Plaintiff was requesting to be off work because Hooper did not know how long she could hold Plaintiff's position.  Hooper revealed that Meeks had denied another individual's request for thirty (30) days of special leave and awarded five (5) days instead.  Due to this prior experience, Hooper thought it unlikely that Meeks would approve 30 days of special leave for Plaintiff.  Plaintiff then asked if she could remain off work until Monday, September 8.  Hooper asked, "[S]o if you come back on Monday, how long are [you] going to be here?  I mean what if you turn around and then don't come the whole last week of September again?"  Plaintiff assured

---

[5]Special leave is reserved for an employee who has used all annual and sick leave, needs to be off work for an extended period of time, and the reason for the leave does not fall under the FMLA.  (Docket No. 29-3, Hooper Depo. at 23-24.)

Hooper, "That's not going to happen Tanesha. I need my job." (Docket No. 23-34 at 4.) Hooper agreed to consult with her own supervisor, Shar Amador, about allowing Plaintiff to miss work Thursday and Friday, September 4 and 5, and she promised to call Plaintiff again that day or the next day. (Id. at 5.) Plaintiff then said: "[Y]ou know James, he's bipolar, and we're at war right now . . . I can't even take him somewhere without him jumping out [of] the car and taking off walking in some direction, and I'm in a hurry to get some place else you know and just . . . I mean all three of them have [a] different diagnosis you know and medication and whatever. And it's too much sometimes[.]" (Id. at 6.)

Hooper called Plaintiff on Friday, September 5. She reported that her supervisor had left the decision up to her whether to give Plaintiff any additional days off work. Hooper instructed Plaintiff to return to work on Monday, September 8 and at that time she would be placed on leave restriction, meaning that a sick day would be unexcused unless Plaintiff brought in a doctor's statement, and Plaintiff could not miss any more time from work until she had built up a week each of annual leave and sick leave, which would take approximately five (5) months to do. In response to this news, Plaintiff described her son's failure to cooperate with her in the mornings, his penchant for missing the school bus and being tardy to school, and his purposeful conduct in trying to get expelled from school. Plaintiff anticipated it was likely her son would be suspended from school again by Monday or Tuesday of the next week, but she agreed to return to her job on Monday as directed. Hooper let Plaintiff know that she would be away from the office on vacation when Plaintiff returned, so the two discussed the job duties Plaintiff should perform in Hooper's absence. (Docket No. 23-35.)

Plaintiff worked her regular hours plus overtime on Monday, Tuesday, and Wednesday,

8

September 8, 9, and 10, 2008. (Docket No. 23-32 at 4.) Plaintiff was a productive worker when she was present. (Docket No. 23-6, Hooper Aff. at 1.) September 10 was, however, the last day Plaintiff worked at DHS.

On September 10, Plaintiff visited Stockton's office carrying a copy of the employee handbook that she printed from the Internet. Plaintiff complained that Hooper had required her to return to work and as a result, Plaintiff missed an important meeting on the previous day that Plaintiff had set up to discuss school services for her daughter. Due to her absence, the teachers chose services that Plaintiff did not want, and Plaintiff was upset. Plaintiff reminded Stockton that she had requested leave from him, Hooper, and Amador, and she felt she was being ignored.

Plaintiff testified that, during the September 10 meeting with Stockton, she specifically requested FMLA leave, and Stockton told Plaintiff that any leave request had to be in writing. When Plaintiff pointed out that Hooper was on vacation, Stockton told her to write a letter requesting time off and to give the letter to Hooper with a copy to him. Plaintiff did not have prior experience with FMLA leave and she did not know that FMLA forms existed, but she learned about FMLA leave through James's case manager at Centerstone. Providers at Centerstone assured Plaintiff that they would provide any documentation necessary to enable Plaintiff to take FMLA leave. Plaintiff asserted that each time she asked Hooper, Stockton or "somebody else" what documentation they needed for FMLA leave, her phone calls were not returned. (Docket No. 23-20, Ritenour Depo. at 95-98, 102-103.)

After the September 10 meeting with Stockton, Plaintiff went home at lunch, wrote a letter on her computer requesting leave until October 1, 2008, (Docket No. 23-37), and returned to work with two copies of the letter in separate envelopes addressed to Hooper and Stockton.

9

Plaintiff placed one envelope on Hooper's computer keyboard. Because Plaintiff worked overtime, she did not have a chance to hand Stockton the envelope addressed to him. Plaintiff left Stockton's envelope on her own work desk and left for the day. When she arrived home, she learned that her son had been suspended from school. She did not return to work on Thursday or Friday, September 11 and 12. (Id. at 98-99, 101.) School daily attendance records for James show that James was placed in in-school suspension on September 11. (Docket No. 23-8 at 1.)

On the afternoon of September 11, Plaintiff sent an email to Stockton from her home email address stating: "I typed up the request for special leave w/o pay yesterday at lunch as you instructed." She explained she had two children out of school and no babysitter, and that is why she did not show up for work. Plaintiff told Stockton where she left the copies of her letter requesting leave and she asked him to retrieve his copy of the letter from her desk as soon as possible. She described the purpose of the leave to secure housing before October 1, attend meetings at her children's schools, attend doctor's appointments, and meet with Centerstone to plan intensive therapy for her oldest son, whose "mental health is affecting his academics and safety at school." (Docket No. 23-38.) Stockton denied that he received Plaintiff's email or her letter requesting leave. (Docket No. 29-1, Stockton Depo. at 60-62.)

Plaintiff continued to miss work. She met with an EAP counselor on Wednesday, September 17 and became so upset by the advice the counselor gave her that she broke out in hives and received medical treatment at the Vanderbilt emergency room ("Vanderbilt ER") on Thursday, September 18. Medications were administered at the ER. In addition, a doctor prescribed an oral steroid and an antihistamine, Atarax, which causes drowsiness. The doctor provided Plaintiff with an excuse from work for September 18 and 19. (Docket No. 23-21,

Ritenour Depo. at 48-49; Docket No. 23-10 at 12, 21, 28-29 & 35.)

On Friday, September 19, Hooper called Plaintiff at home. Hooper related that she spoke to Stockton on Wednesday and he told her he did not receive Plaintiff's leave request letter, so that was why Plaintiff had not heard anything from Stockton. Plaintiff insisted that she left a letter for both Hooper and Stockton. Plaintiff informed Hooper that she and Stockton "talked about the family leave whatever, and he said it's not family leave it's medical leave and if there's no medical issues and I said well I'm gonna tell you something for my son's own safety issues. Right now he's off the chain." (Docket No. 23-39 at 4.) As in prior conversations, Plaintiff revealed a list of personal issues causing her difficulty, including the new problem of stress-related hives, for which Plaintiff said she had been treated medically and had a doctor's excuse for missing work. Hooper offered various suggestions for ways Plaintiff might approach her problems and directed Plaintiff to call Stockton about her need for leave. Hooper was not aware that Plaintiff had asked Stockton verbally and in the email to grant her leave without pay until October 1. (Docket No. 23-39; Docket No. 29-3, Hooper Depo. at 37.)

Stockton and Plaintiff also communicated by telephone on September 19. (Docket No. 23-40.) Stockton pointed out that Plaintiff had been absent on unapproved leave from work since September 10. (Docket No. 23-32 at 4-6.) He told Plaintiff that he looked for her leave request on her desk and on Hooper's desk, but he did not find a copy of the letter in either place. He chastised Plaintiff for not following through on what he asked her to do and said he did not want to see her lose her job due to her failure to provide the necessary written request for leave. Stockton made it clear to Plaintiff that she had not requested time off in writing before taking the leave, and she could not be absent from work unless leave was approved in advance. By making

11

these statements, Stockton was referring to special leave, not FMLA leave. (Docket No. 29-1, Stockton Depo. at 85.) Stockton instructed Plaintiff to provide Hooper with all information in Plaintiff's possession, including doctors' statements, to explain her absence from work, and he also instructed Plaintiff to show up for work until any further leave was approved. (Docket No. 23-40 at 12-14.) Stockton believed Plaintiff was in violation of state leave policies. (Docket No. 29-1, Stockton Depo. at 80.)

Plaintiff started taking her prescribed medications for hives on September 19; however, she returned to the Vanderbilt ER on Saturday, September 20 with continued complaints of hives. On physical examination the hives appeared to be resolved. She was instructed to finish taking the previously prescribed medications and was provided with a work excuse for Monday and Tuesday, September 22 and 23.[6] (Docket No. 23-10 at 19, 21, 23, 25-26.)

Plaintiff returned to the Vanderbilt ER on Sunday, September 21 for another episode of hives and she complained of an allergic reaction to the oral steroid. Although the hives appeared to be resolved, the doctor changed the antihistamine, prescribed Ativan for anxiety, and provided a work excuse for Sunday, September 21 through Tuesday, September 23. (Id. at 5-7, 12, 16.)

On Wednesday, September 24, Plaintiff visited her primary care physician, Dr. Michele Rorie, for followup. Dr. Rorie did not observe any hives except for some redness in Plaintiff's palms. She prescribed a steroid skin cream and provided a work excuse for September 24 and Thursday, September 25. (Docket No. 23-18, Rorie Depo. at 5, 11.)

_____

[6]Although the medical record states, "Please excuse from work Monday and Tuesday (9/21-9/22), September 21, 2008 was a Sunday and September 22 was a Monday. If the physician intended to excuse Plaintiff from work Monday and Tuesday, then Plaintiff had a medical excuse for September 22 and 23.

12

Plaintiff admits that, after the September 19 telephone calls with Hooper and Stockton, she did not provide Hooper with her leave request letter or any written doctors' excuses she possessed regarding her children or herself.  (Docket No. 23-21, Ritenour Depo. at 31-33.)  Plaintiff admits that she did not show up for work on September 22, 23, 24 and 25.  (Id. at 6.)

Hooper claimed that Plaintiff also did not call in on those dates to explain the reason for her absences.  (Docket No. 29-3, Hooper Depo. at 21; Docket No. 23-6, Hooper Aff. at 2; Docket No. 23-32 at 7.)  Plaintiff admitted that she did not call Hooper on September 23 and 24, but she did not know whether she called in on September 22 and September 25.  (Docket No. 23-20, Ritenour Depo. at 50-51.)  A DHS telephone log shows one 44-second call from Plaintiff's home telephone number to Stockton on September 22, but no calls from Plaintiff to Hooper from September 22 through September 25.  (Docket No. 29-1 at 119.)

The applicable Tennessee Department of Personnel Rule 1120-2.14 provided in pertinent part:

> (5)  Job Abandonment.  An employee who is absent from duty for more than three (3) consecutive business days without giving notice to the appointing authority or appropriate manager concerning the reason for such absence and without securing permission to be on leave, . . . absent unusual circumstances causing the employee's absence . . . is considered as having resigned not in good standing.

(Docket No. 23-3 at 13.)  Plaintiff had a copy of the employee handbook, which contained the following pertinent portions of the DHS attendance and leave policy:

> Absenteeism
>
> If you must be late for work or absent because of illness or for an unforeseen circumstance, personally notify your appropriate manager or immediate supervisor as soon as possible by telephone.  Certain supervisors may designate a specific call-in time.

When you have to be late or absent, it is important that you give your supervisor maximum advance notice so that replacement arrangements or work assignments can be made. Your supervisor will cooperate with you on these occasions if you will personally give as much advance notification as possible. However, excessive absenteeism is inappropriate. Remember that supervisors must account for and approve all employee absences.

* * *

Sick Leave

* * *

If you are not at work during your regular work hours, you must be on authorized leave. This means that your supervisor knows of and has approved your absence. In accordance with the law and rules, job abandonment occurs when an employee is absent from work without approval for three consecutive workdays or two consecutive workdays following the expiration of any authorized leave. In the case of job abandonment, the department considers that the employee resigned "not in good standing." Therefore, it is imperative that you keep your supervisor informed of your need for leave as it arises.

(Docket No. 23-4 at 16, 19 (emphasis in original).)

In light of these policies and Plaintiff's failure to call Hooper regarding her absences on September 12, 16, 17, 18, 22, 23, 24, and 25 and her failure to return to work after notification that she was on unapproved leave, Hooper recommended termination of Plaintiff's employment for job abandonment. (Docket No. 29-3, Hooper Depo. at 21, 35; Docket No. 29-2 at 77-78.) Hooper and her supervisors, Amador and Meeks, met to discuss the recommendation. They listened to the recording of the September 19 telephone conversation between Plaintiff and Hooper, and they reviewed the DHS telephone log to verify that Plaintiff had not called Hooper between September 22 and 25. After reviewing the matter, Meeks and Amador approved the termination recommendation. (Docket No. 29-4, Amador Depo. at 10, 12, 18, 22-24; Docket No. 29-2, Meeks Depo. at 18-19.) On September 30, 2008, DHS Commissioner Virginia T. Lodge

sent Plaintiff a letter terminating her employment for job abandonment effective September 25, 2008. (Docket No. 23-2.)

Meeks did not know until he was told at his deposition that Plaintiff's children had disabilities and were taking medication, that the children were receiving mental health services from Centerstone, and that James is bipolar. He stated such information would not have changed his mind about recommending termination of Plaintiff's employment because the reason for the termination was Plaintiff's no-call, no-show for a period of three days. Meeks also did not learn until his deposition that Plaintiff had requested FMLA leave from Stockton, and Meeks would have wanted to know that information. It would have been inappropriate for Stockton to make the decision whether Plaintiff was entitled to FMLA leave. Meeks was not aware that Plaintiff had requested leave through the end of September 2008. (Docket No. 29-2, Meeks Depo. at 22-23, 25-26, 42, 54-55.)

After losing her job, Plaintiff asked Cristina Henry, a nurse practitioner at Centerstone, to complete FMLA paperwork for Plaintiff. (Docket No. 23-21, Ritenour Depo. at 53.) Henry completed the FMLA forms on October 28, 2008, indicating that Plaintiff needed leave for the period August 20 to October 1, 2008, due to James's mental condition. (Docket No. 23-11, Henry Depo. at 47-52, 54-57, 69; Docket No. 23-12.)

During an October 11, 2008 office visit, Dr. Rorie also completed FMLA paperwork at Plaintiff's request for the period September 17, 2008 through September 26, 2008, noting that Plaintiff was incapacitated and unable to work due to stress-induced hives and sedating medication. Dr. Rorie opined that Plaintiff's outbreak of hives qualified as a serious medical condition under the FMLA because Plaintiff had an allergic reaction to prescribed medication

15

that prolonged her course of treatment. (Docket No. 23-18, Rorie Depo. at 12-13, 17-21, 22, 25-26, 34-35; Docket No. 23-19 at 16-23.)

Plaintiff filed a complaint with the U.S. Department of Labor ("DOL") asserting an FMLA violation. (Docket No. 23-44.) Plaintiff provided her written statement and timeline of events, the FMLA forms completed by Henry and Dr. Rorie, and the written work excuses she received for her September medical visits but which she did not give to her supervisor at DHS before her employment termination.[7] During an interview with a DOL representative on October 31, 2008, Plaintiff indicated the state's call-in policy was to contact the supervisor one hour before the scheduled hour of work. (Docket Nos. 23-31, 23-41 & 23-43, 23-44 at 4.)

## III. Analysis

### A. Standard of Review

Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To prevail, the moving party must establish the absence of a genuine issue of material fact as to an essential

---

[7]DHS's motion to strike all information concerning DOL's investigation of Plaintiff's FMLA complaint and DOL's decision on that complaint (Docket No. 36) will be granted. First, Plaintiff did not file a response to the motion to strike, and under the Local Rules, the lack of a response indicates there is no opposition to the motion. L.R.7.01(b). Second, while this Court has discretion at trial to decide whether to admit into evidence the agency's probable cause determination, at the summary judgment stage, the Court need only determine whether the agency decision creates a genuine issue of material fact for trial. See Alexander v. CareSource, 576 F.3d 551, 562 (6th Cir. 2009). The results of the DOL's investigation and its decision do not create genuine issues of material fact for trial on whether Plaintiff violated her employer's attendance policies. The Court provides a few facts about the DOL matter only to identify the information Plaintiff submitted to the DOL because such information is relevant to the motion for summary judgment.

16

element of the opposing party's claims.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The non-moving party must go beyond the pleadings and produce specific facts requiring a trial.

Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002).  The Court's function is not to

weigh the evidence, but to draw all reasonable factual inferences in the light most favorable to

the non-moving party and determine if there is a genuine issue of material fact for trial.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Little Caesar

Enter., Inc. v. OPPCO, LLC, 219 F.3d 547, 551 (6th Cir. 2000).

B.  DHS's Motion For Summary Judgment

The FMLA entitles an eligible employee to take up to twelve weeks of leave during any

twelve-month period if the employee has a "serious health condition that makes the employee

unable to perform the functions of the position of such employee," or to care for a child who has

a "serious health condition."  29 U.S.C. § 2612(a)(1)(C) &(D).  The Sixth Circuit recognizes two

distinct theories for recovery under the FMLA:  (1) the interference theory arising from 29

U.S.C. § 2615(a)(1); and (2) the retaliation theory arising from 29 U.S.C. § 2615(a)(2).  Hoge v.

Honda of Am., Inc., 384 F.3d 238, 244 (6th Cir. 2004).  Plaintiff seeks to recover under both

theories.

To prevail on the interference claim, Plaintiff must establish that (1) she is an eligible

employee; (2) DHS is an employer; (3) Plaintiff was entitled to leave under the FMLA;

(4) Plaintiff gave DHS notice of her intention to take leave; and (5) DHS denied Plaintiff FMLA

benefits to which she was entitled.  See Wysong v. Dow Chem. Co., 503 F.3d 441, 447 (6th Cir.

2007).  As to the final element, if an employer takes an employment action based, in whole or in

part, on the fact that the employee took FMLA-protected leave, the employer has denied the

employee a benefit to which she is entitled.  Id.  An employer is liable for interference if it uses FMLA leave as a negative factor in deciding to terminate an employee.  Id. at 448.  Such conduct can also form the basis for an FMLA retaliation claim.  Id. at 447 n.2.

To prove a *prima facie* case of retaliation, Plaintiff must show that (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between the exercise of the right and the adverse employment decision.  Skrjanc v. Great Lakes Power Serv., 272 F.3d 309, 314 (6th Cir. 2001).  If Plaintiff makes the *prima facie* showing, the burden shifts to DHS to produce evidence of a legitimate, non-discriminatory reason for the adverse employment action, and the burden then returns to Plaintiff to show that DHS's proffered reason was a pretext for unlawful discrimination.  Bryson v. Regis Corp., 498 F.3d 561, 570 (6th Cir. 2007).

Whether Plaintiff can proceed to trial on her FMLA claims, DHS contends, is secondary to the issue that should assure DHS summary judgment:  Plaintiff violated her employer's absentee call-in rule on September 22 through 25, 2008, and consequently, her employment was legitimately terminated.  In support DHS relies on Bacon v. Hennepin County Med. Ctr., 550 F.3d 711 (8th Cir. 2008); Bones v. Honeywell Int'l, Inc., 366 F.3d 869 (10th Cir. 2004); and Lewis v. Holsum of Fort Wayne, Inc., 278 F.3d 706 (7th Cir. 2002).

In Bacon, the employee submitted to her employer FMLA forms that certified her need for medical leave due to an allergic reaction; however, the written medical documentation did not specify the length of her expected absence or a tentative date for her return to work.  Id. at 712-13 & n.2.  The employer did not officially approve FMLA leave, but recorded the employee's absences as FMLA leave when the employee called in daily for a month.  Id.  at 713.

18

When the employee failed to call in for three consecutive days, the employer enforced its policy that such a failure to call in for three days straight is tantamount to a voluntary termination. Id. The Eighth Circuit affirmed the district court's grant of summary judgment for the employer, holding that an employer will not be held liable for interfering with an employee's FMLA rights if the employer can prove that it would have made the same decision had the employee not exercised FMLA rights. Id. at 714-15. The court cited an FMLA regulation providing that an employer may require an employee on FMLA leave to report periodically on the employee's status and intent to return to work, 29 C.F.R. § 825.309(a), and ruled that employers who fire employees for failing to call in pursuant to company policy do not violate the FMLA. Id. at 715.

The employee argued that her employer failed to provide her with specific written notice requiring her to call in every day, relying on 29 C.F.R. § 825.301(b)(1), which directs an employer to provide the employee with "written notice detailing the specific expectations and obligations of the employee and containing any consequences of a failure to meet these obligations." Id. The Eighth Circuit rejected her contention on the ground that § 825.301(b)(2) provides that the "specific notice may include other information– e.g., whether the employer will require periodic reports of the employee's status and intent to return to work, *but is not required to do so.*" Id. (emphasis in original). Because the company made explicit that its call-in policy was effective even when an employee was on FMLA leave, the employee was aware of the call-in policy, and the employee did not generate a genuine issue of material fact about whether her supervisor told her she did not need to call in each day, summary judgment was appropriate. Id. at 716.

Case 3:09-cv-00803   Document 40   Filed 10/04/10   Page 19 of 24 PageID #: 2586

Using an analysis similar to that of the Eighth Circuit, in <u>Bones</u> the Tenth Circuit affirmed a grant of summary judgment for an employer because the employee submitted FMLA paperwork, but failed to show up for work or call in for three consecutive days while the forms were being processed. <u>Bones</u>, 366 F.3d at 874, 878-79. Although the employer interfered with the employee's FMLA rights, the termination was justified based on the employee's violation of the employer's attendance policy. <u>Id.</u> at 878.

Similarly, the Seventh Circuit affirmed summary judgment for an employer based on 29 C.F.R. § 825.302(d), which provides that an employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave. <u>Lewis</u>, 278 F.3d at 710. The court held that the employer's rules and attendance policy were "usual and customary requirements." <u>Id.</u> (relying on <u>Gilliam v. UPS, Inc.</u>, 233 F.3d 969, 971-72 (7th Cir. 2000) for the proposition that the FMLA does not authorize employees on leave to keep their employers in the dark about when they will return).

In response to DHS's summary judgment motion, Plaintiff did not mention these cases or try to distinguish them in any way. Instead, Plaintiff emphasized that she created genuine issues of material fact on the elements of her FMLA interference claim; that DHS should be equitably estopped from asserting that Plaintiff's leave was not qualified leave under the FMLA; that DHS discouraged Plaintiff from exercising her FMLA rights by improperly informing her that she could not apply for FMLA leave and by failing to ask her to provide medical certification; and that Plaintiff was on leave for an FMLA-qualifying reason when DHS decided to terminate her.

The Court readily agrees that there are genuine issues of material fact about whether Plaintiff was eligible for FMLA leave, whether she was entitled to take FMLA leave, whether

she gave DHS notice of her intention to take FMLA leave, and whether DHS denied her FMLA benefits to which she was entitled. Even assuming, however, that Plaintiff was entitled to take unpaid FMLA leave and that DHS should have placed her on unpaid FMLA leave from August 20 to October 1, 2008, as certified by Cristina Henry and Dr. Rorie on the FMLA forms completed for Plaintiff after her termination, there still is no dispute that Plaintiff failed to contact her supervisor, Tanesha Hooper, on September 22, 23, 24 and 25 in accordance with the generally applicable DHS policies on absenteeism and job abandonment.

The FMLA is not a strict liability statute, and "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." Edgar v. JAC Prods., Inc., 443 F.3d 501, 508 (6th Cir. 2006); Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 979 (6th Cir. 2005) ("As long as an employer can show a lawful reason, i.e., a reason unrelated to an employees' exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights."); Arban v. West Publ'g Corp., 345 F.3d 390, 401 (6th Cir. 2003) ("An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave.").

In Allen v. Butler County Comm'rs, 331 Fed. Appx. 389, 393 (6th Cir. 2009), the Sixth Circuit considered as a matter of first impression "what happens when an employer runs sick leave concurrently with FMLA leave and the employee violates the more stringent requirements of the paid sick leave policy[.]" In analyzing that question, the court relied on Gilliam v. UPS,

233 F.3d 969 (7th Cir. 2000), and Callison v. City of Philadelphia, 430 F.3d 117 (3rd Cir. 2005), cases in which other circuits held that the FMLA does not preclude an employer from enforcing a rule requiring employees on FMLA leave to keep the employer informed about the employee's plans. The call-in procedure examined in Callison was held not to compromise FMLA rights because it neither prevented nor discouraged employees from taking FMLA leave, but simply ensured that employees did not abuse their FMLA leave. Allen, 331 Fed. Appx. at 395 (citing Callison). The Sixth Circuit adopted that analysis to reverse partial summary judgment for the plaintiff and to remand with instructions to the district court to grant summary judgment in favor of the employer. Id. at 397.

Even if Plaintiff was entitled to take FMLA leave from September 22 through 25, 2008, for her own medical condition, she admittedly made no effort to provide her employer with the medical excuses in her possession for those work dates, nor did she give her employer any idea when her medical condition might improve so that she could return to work. Plaintiff was familiar with DHS's absenteeism policy, which required her to call in and notify her supervisor personally of her need to miss work one hour before the start of her work shift. Plaintiff admitted that she did not show up for work September 22 through 25 and she admitted that she did not call Hooper on September 23 and 24. Hooper testified that Plaintiff did not call her on September 22 through 25, and a DHS telephone log confirmed there were not any calls from Plaintiff's home telephone number to Hooper during that time period. The testimony of Hooper, Amador and Meeks shows that the reason DHS terminated Plaintiff's employment was her violation of the absenteeism policy. Thus, by not producing any contradictory evidence, Plaintiff has failed to generate a genuine issue of material fact for trial on whether the reason DHS

terminated Plaintiff's employment was legitimate and unrelated to Plaintiff's exercise of FMLA rights. See id. at 394. Therefore, DHS is entitled to summary judgment on the FMLA interference claim. See id.; Allen v. STHS Heart, LLC, 2010 WL 2133901 at *10 (M.D. Tenn. May 21, 2010) (adopting same analysis and citing Allen v. Butler County Comm'rs and Callison); Nelson v. Wayne State Univ., 2009 WL 3818193 at *6 (E.D. Mich. Nov. 13, 2009) (same); Lee v. City of Columbus, 2009 WL 2392940 at *5 (S.D. Ohio July 31, 2009) (same); Bacon 550 F.3d at 714-15; Bones, 366 F.3d at 878; Lewis, 278 F.3d 710. Plaintiff makes no argument that Hooper told her she did not have to call in daily, a circumstance which might give rise to an issue for trial on the doctrine of equitable estoppel. See Bacon, 550 F.3d at 716 (holding plaintiff failed to generate material issue on whether employer should be equitably estopped due to supervisor conduct). Cf. Allen, 2010 WL 2133901 at *10 (finding employer not liable simply because it enforced its generally applicable attendance policy against plaintiff, but finding enough evidence for jury to conclude reasonably that plaintiff's supervisor told her she did not have to follow the generally applicable call-in procedure).

Furthermore, even assuming that Plaintiff satisfied the *prima facie* case for an FMLA retaliation claim, a reasonable jury could find that DHS legitimately terminated Plaintiff's employment due to her violation of the policy on absenteeism. Plaintiff has not challenged the evidence outlined in the previous paragraph to show that there is a genuine issue of material fact for trial on whether DHS's proffered reason for the termination was a pretext for FMLA retaliation against Plaintiff. See Dew v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000) (a plaintiff can demonstrate pretext by showing that the proffered reason had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to warrant the

challenged conduct). Therefore, DHS is entitled to summary judgment on the FMLA retaliation claim as well.  See Bryson., 498 F.3d at 570.

In light of the above analysis, the Court need not reach the other issues raised by the parties.

IV.  Conclusion

For all of the reasons stated, Defendant's Motion For Summary Judgment (Docket No. 21) will be granted.  Defendant's Motion To Strike Information Regarding Department of Labor Investigation (Docket No. 36) will also be granted.  This case will be dismissed with prejudice.

Todd Campbell

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE

24